**Lisa Ruhl CARTER, Administrator of the Estate of Raymond John Ruhl, Deceased, Plaintiff,**

**v.**

**Alfred E. BUSCHER, Warden at Vandalia Correctional Center, in his individual capacity, et al., Defendants.**

**No. 90-3002.**

United States District Court, C.D. Illinois, Springfield Division.

April 26, 1991.

Robert Weiner, Springfield, Ill., for plaintiff.

Karen McNaught, Asst. Atty. Gen., Springfield, Ill., for defendants.

## OPINION

RICHARD MILLS, District Judge:

Civil rights action.

The facts are singular.

Cross-motions for summary judgment.

Judgment for Defendants.

Case closed.

### I. Facts

Plaintiff's husband, Raymond Ruhl, was being investigated by the ISP in January, 1988, for solicitation to murder his wife—the Plaintiff. In fact, during the investigation Plaintiff was offered and accepted protective custody by the ISP. With the assistance of a co-conspirator, Roger Arkebauer, the police obtained sufficient evidence to authorize Ruhl's arrest. *See Arkebauer v. Kiley*, 751 F.Supp. 783 (C.D.Ill. 1990).

Ruhl worked as a correctional officer at the Vandalia Correctional Center. Ruhl was also believed by the ISP to run a gun shop out of his home and had been heard to brag that he was always armed—even while working at the prison in violation of DOC regulations.

On January 15, 1988, ISP agents Virgil Lee Bensyl, David P. McLearin, and Tamara J. Byers, with the assistance of their superior officers, planned the arrest of Ruhl for the solicitation to murder his wife. Michael Heltsley and Michael McKinney, internal investigators for the DOC, were also asked to assist in Ruhl's arrest.

The police consciously chose not to attempt Ruhl's arrest at his home because of his ready access to guns. Further, because Ruhl allegedly was armed at the prison where he worked, and the police would have had to surrender their guns before entering the prison, they chose not to arrest him at the prison. Instead, the police, with the assistance of Alfred Buscher, Vandalia's warden, devised a scheme in which Buscher would contact Ruhl at home and ask him to assist the niece of a fellow warden (played by Byers) whose car had broken down near Ruhl's home.

At approximately 5:50 p.m., Buscher called Ruhl and asked him to assist the

stranded motorist. Ruhl agreed to help and Buscher then telephoned McLearin and told him that Ruhl was on his way. Byers, along with Bensyl and McLearin (all dressed in civilian clothing) parked their car on the west side of Route 51 just south of Oconee, Illinois and waited for Ruhl to arrive. Heltsley and McKinney waited nearby as backup.

At approximately 6:00 p.m. Ruhl approached the scene from the south, made a U-turn, and parked approximately 15 feet behind Byers' vehicle on the west side of the highway. Byers, posing as a stranded motorist, approached Ruhl's vehicle and spoke with Ruhl through the open, driver's side window. Ruhl refused to leave his car which he left running with the transmission in gear.

When Ruhl refused to leave his car, Bensyl also walked back to Ruhl's car. McLearin at this time signaled Heltsley and McKinney to move in as back up. When Bensyl arrived at Ruhl's vehicle he stood slightly behind and to the left of Byers at the driver's side window. Bensyl shined his flashlight in the window and announced "State Police."

Immediately after Bensyl announced "State Police," Ruhl opened fire with a 9mm Browning semi-automatic pistol from inside the vehicle. Bensyl was immediately struck and killed. Ruhl then fired at least four shots through his front windshield at McLearin who was approaching from the right front of Byers' vehicle. McLearin was struck once in the left wrist and received a grazing wound to his head. McLearin was then struck by Ruhl's vehicle as it rolled forward. Eventually, McLearin sought shelter in a ditch along the west side of the road.

Ruhl leaned down to the right on his front seat, firing back at Byers as she moved toward the rear of Ruhl's vehicle. Byers fired seven rounds through the back windshield attempting to hit Ruhl. Due to various obstructions such as the back windshield and seat, however, Ruhl was not hit by Byers' fire. Ruhl then exited his vehicle in a crouched position. Byers fired her last round and once again missed hitting Ruhl.

Heltsley and McKinney, meanwhile, had arrived at the scene and stopped their vehicle on the west side of the highway shortly behind Ruhl's car. While attempting to fire at Byers, Ruhl was distracted by McLearin who was then shot a third time by Ruhl. Heltsley, armed with a .12 gauge shotgun, was unable to fire at Ruhl during this exchange because Byers was in his line of fire.

After shooting McLearin for the third time, Ruhl spun back toward Byers, who was now out of ammunition. At this point Heltsley, who had positioned himself near the right passenger door of McKinney's vehicle, shot Ruhl in the chest with a single .12 gauge shotgun slug. Ruhl fell to the ground and dropped his weapon.

Byers, believing that Ruhl was attempting to get up and retrieve his weapon, ran to Ruhl, picked up his gun, and fired the last round at Ruhl, striking him in the forearm. Simultaneously McLearin fired twice at Ruhl, striking him once in the left foot and lower leg. According to the coroner's inquest, Ruhl died within a few seconds from the shotgun wound to his chest. The entire sequence of events, from the time Ruhl shot Bensyl until all shooting ceased, is estimated to have lasted between 45 and 60 seconds.

Plaintiff, as administratrix of Ruhl's estate, then commenced this civil rights action against Warden Buscher, Agents Byers, McLearin, Heltsley and McKinney, Captain Murphy and the Estate of Agent Bensyl. Plaintiff alleges that

> by reason of their ill conceived plan in the attempt to arrest Raymond John Ruhl along a darkened highway instead of inside the correctional institution where he worked, the Defendants, in their attempt to apprehend and arrest Raymond John Ruhl, provoked a situation whereby unreasonable deadly force was used in the attempt to seize his person in violation of the Fourth Amendment. . . .

## II. Summary Judgment

██ Under Fed.R.Civ.P. 56(c), summary judgment should be entered "if the plead-

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nevertheless, the rule is also well established that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, the "preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed." *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III.  Analysis

Plaintiff does not allege that the Defendants lacked probable cause to arrest her husband.  Rather, her complaint alleges that the Defendants violated her husband's civil rights by the specific manner in which they went about affecting his arrest.

In her motion for summary judgment, Plaintiff argues that the Supreme Court cases of *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) govern this action and entitle her to judgment as a matter of law.  In their cross-motion for summary judgment Defendants also rely upon *Garner* and *Brower* but argue that these cases fully justify their use of deadly force.

In *Garner* Memphis police officers shot and killed a 15 year old unarmed burglary suspect who had refused orders to halt and was attempting to flee by climbing a fence. In using deadly force, the police relied upon a Tennessee statute which permitted law enforcement officers to use all reasonable force necessary to apprehend fleeing felony suspects.  *Garner*, 471 U.S. at 4, 105 S.Ct. at 1697.

The Supreme Court held that the use of deadly force to apprehend a fleeing suspect constituted a seizure under the Fourth Amendment and therefore had to be "reasonable."  Further, the Court held that it was unreasonable to use deadly force to stop a fleeing suspect unless the police have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others...." *Id.* at 11, 105 S.Ct. at 1701.

In *Brower* the plaintiff's decedent died when he crashed a stolen car into a police roadblock while fleeing from pursuing officers.  The plaintiff alleged that the police had placed a semi-truck across both lanes of the highway, at night, and around a sharp curve.  Further, the police allegedly placed a patrol car between the roadblock and approaching automobile with its headlights on such that they blinded the oncoming driver.

The district court dismissed the suit and the appellate court affirmed on the basis that the police had not "seized" plaintiff's decedent.  The Supreme Court, relying upon *Garner*, held that the police "seize" a person within the meaning of the Fourth Amendment when the person is "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 599, 109 S.Ct. at 1382.  Thus, because the fleeing car thief was stopped by the roadblock which had been put in place for that purpose, he was seized within the meaning of the Fourth Amendment.

The Court then stated, however, that it is not sufficient to simply prove a seizure; the plaintiff also must establish that the seizure was "unreasonable." *Id.*  Therefore, the Court vacated the dismissal and remanded for a determination of whether the seizure was unreasonable. *Id.* at 599–600, 109 S.Ct. at 1382–83. *See also Lester*

*v. City of Chicago*, 830 F.2d 706 (7th Cir. 1987).

 In the case at bar, there is no question that the police seized Ruhl by the use of deadly force. However, there is also no question that, as a matter of law, that seizure was reasonable. As recognized by *Garner,* the police are authorized to use deadly force to apprehend a felon when they have probable cause to believe that the felon poses a risk of serious harm to the officers or others. The state police and corrections officers did not use deadly force until Ruhl had killed agent Bensyl and shot agent McLearin three times. Clearly they had probable cause to believe that their lives were in danger if they did not return Ruhl's fire.

What Plaintiff essentially is arguing is that the police should have attempted to arrest Ruhl in some other manner—one that would have posed less of a risk of gunplay. In her response to Defendants' cross-motion for summary judgment Plaintiff suggests the arrest could have occurred "outside the prison gates, in the parking lot of the prison, or on the street in a well-lit location."

Under Illinois law, when the police have probable cause to arrest someone, that arrest can be made at any time and anywhere within the jurisdiction of the state. Ill.Rev.Stat. ch. 38, ¶ 107–5. Ruhl did not have a "right" to be arrested at a specific time or location. The police exercised their discretion in an attempt to minimize Ruhl's access to guns and thus reduce the risk of danger to themselves.

In *Terket v. Lund,* 623 F.2d 29 (7th Cir. 1980), the circuit court relied upon ¶ 107–5 to hold that Evanston city police did not violate the plaintiff's civil rights by arresting him in Chicago outside of their jurisdiction. The court held that the officers' conduct was legally authorized and thus not a violation of the plaintiff's civil rights. *Id.* at 30–31.

Similarly, the Defendants' in the case at bar were authorized by Illinois law to choose the time and place of Ruhl's arrest. Their conduct therefore did not violate his civil rights. A contrary holding would create a cottage industry wherein the federal courts would be called upon to second guess police officers as to every discretionary decision regarding time and place of arrest.

*Ergo,* Defendants' cross-motion for summary judgment (d/e 13) is ALLOWED. Plaintiff's motion for summary judgment (d/e 9) is DENIED. The pending motions in limine (d/e 5, 10, 11) are DENIED AS MOOT. Plaintiff's motion for leave to file an amended complaint and add a defendant (d/e 16) is DENIED.

Case CLOSED.