973 F.2d 1328
 Lisa Ruhl CARTER, Administrator of the Estate of Raymond J.
Ruhl, Deceased, Plaintiff-Appellant,
v.
Alfred E. BUSCHER, Warden, Vandalia Correctional Center, in
his individual capacity, Michael Heltsley, Corrections
Officer, in his individual capacity, Michael McKinney,
Corrections Officer, in his individual capacity, et al.,
Defendants-Appellees.
 No. 91-2029.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 27, 1992.
Decided Sept. 1, 1992.
Rehearing and Rehearing En Banc Denied Oct. 1, 1992.
 
 Robert Weiner, Michael W. Ochoa, argued, Springfield, Ill., for Lisa Ruhl Carter.
 Jerald S. Post, Asst. Atty. Gen., argued, Civil Appeals Div., Chicago, Ill., for defendants-appellees.
 Before MANION and KANNE, Circuit Judges, and LEE, District Judge.*
 MANION, Circuit Judge.
 
 
 1
 Lisa Ruhl Carter's husband, Raymond Ruhl, was shot and killed when Illinois State Police officers tried to arrest him for conspiracy and solicitation to have Carter murdered. Carter, as administrator of Ruhl's estate, brought this action under 42 U.S.C. § 1983 seeking $3,000,000 in damages from Illinois State Police officers, employees of the Illinois Department of Corrections and the estate of a slain police officer. Carter alleged that the defendants violated her husband's Fourth Amendment and Fourteenth Amendment rights because their plan for his arrest "provoked a situation whereby unreasonable deadly force was used in the attempt to seize his person." Carter and the defendants filed cross-motions for summary judgment. The district court granted the defendants' motion and denied Carter's. 763 F.Supp. 392 (1991). We affirm.
 
 I. Facts
 
 2
 If fact is stranger than fiction, this case is a prime example. Initially, the facts read like the script from Keystone Cops. But what began as a dubious scheme ended in tragic bloodshed.
 
 
 3
 In January 1988, the Illinois State Police were investigating Ruhl for solicitation to murder his wife, Lisa Ruhl Carter. With the assistance of Ruhl's co-conspirator, the state police obtained sufficient evidence to authorize Ruhl's arrest. Arresting Ruhl, however, proved nettlesome. Based on reliable information, the state police knew that Ruhl ran a gun shop out of his home and bragged that he was always armed--even while working inside a prison as a correctional officer for the Illinois Department of Corrections ("DOC"), in violation of DOC regulations. To minimize Ruhl's access to weapons and thereby reduce the risk of injury to state police officers and bystanders, the state police officers concocted a scheme to arrest Ruhl on U.S. 51, just south of the Oconee, Illinois intersection.
 
 
 4
 On January 15, 1988, state police officers Tamara Ann Byers, David P. McLearin and the late Virgil Lee Bensyl together with DOC officers Michael Heltsley and Michael McKinney carried out their ill-fated scheme. To set the plan in motion, McKinney telephoned defendant Alfred E. Buscher, an assistant warden with the DOC. Buscher then telephoned Ruhl and asked Ruhl to assist his niece who was supposedly having car trouble on U.S. 51. According to the script, Byers would portray the stranded niece and Bensyl and McLearin would portray two friends who had been riding with her. All three wore street clothes in keeping with their roles. Heltsley and McKinney planned to stay in their car a short distance from the scene and wait for a signal from the officers on the scene indicating that Ruhl had been arrested. When Ruhl arrived, Byers would ask him to look at her car, and when Ruhl came to inspect the engine, Bensyl would shine a flashlight in Ruhl's eyes, announce that the three stranded motorists were state police and place Ruhl under arrest. Unfortunately, Ruhl followed a different script.
 
 
 5
 When Ruhl arrived at the scene, it was dark. Ruhl remained in his car with the motor on and the car in gear 20 to 25 feet behind the "stranded" car. While Bensyl and McLearin waited by the hood of Byers' car, Byers walked back to Ruhl's car alone, leaned down to talk with him through the driver's window and tried to persuade him to take a look at her engine. According to Byers, Ruhl appeared nervous. Apparently impatient with Byers' progress, Bensyl came back to Ruhl's car and stood behind Byers. Drawing his police flashlight, Bensyl shone it into Ruhl's eyes and announced, "state police."
 
 
 6
 Ruhl responded by drawing an automatic weapon and shooting over Byers' shoulder striking Bensyl in the chest. As Bensyl fell to the ground, Byers drew her weapon and began to fire at Ruhl through the rear side window and then through the rear window of the car. As the gunfire erupted, McLearin rushed toward Ruhl's car, but Ruhl shot at him three times through the windshield, and McLearin hit the ground wounded. Ruhl then turned his weapon on Byers who was still firing at him through his rear window. Kicking his car door open, Ruhl spun out of the car and fired another round at Byers, and Byers fired her last round in return. As Ruhl stepped toward Byers and raised his gun again, McLearin surfaced from a ditch behind Ruhl's car. Startled, Ruhl shot at McLearin. Meanwhile, Heltsley and McKinney arrived on the scene. Heltsley fired his shotgun, striking Ruhl in the chest. Ruhl collapsed, but when he reached for the handgun he had dropped, Byers grabbed it and fired once more at Ruhl.[1]
 
 
 7
 At the end of the shootout, which had lasted approximately a minute, Ruhl and Bensyl lay dead and McLearin lay bleeding on the side of the highway.
 
 
 8
 Nearly two years later, on January 5, 1990, Carter, ironically the intended victim of Ruhl's murder plot, filed this section 1983 action as administrator of Ruhl's estate alleging "[t]hat by reason of their ill conceived plan in the attempt to arrest [Ruhl] along a darkened highway instead of inside the correctional institution where he worked, the Defendants ... provoked a situation whereby unreasonable deadly force was used in the attempt to seize his person in violation of the Fourth Amendment...." (Complaint p 20). The defendants argued there had been no Fourth Amendment violation. Alternatively, the defendants raised qualified immunity as a defense.
 
 
 9
 Addressing the parties' motions for summary judgment, the district court observed that "[w]hat Plaintiff essentially is arguing is that the police should have attempted to arrest Ruhl in some other manner--one that would have posed less of a risk of gunplay." Mem.Op. at 8. The district court reasoned that since the police had probable cause to instigate the arrest and were justified in their use of deadly force once Ruhl began shooting, the arrest was reasonable as a matter of law. Furthermore, the court noted that "[a] contrary holding would create a cottage industry wherein the federal courts would be called upon to second guess police officers as to every discretionary decision regarding time and place of arrest." Mem.Op. at 9. Accordingly, the district court granted defendants' motion for summary judgment. Carter appeals. We affirm.
 
 II. Analysis
 
 10
 We review a district court's entry of summary judgment de novo. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Where the parties agree as to the material facts, as they do here, we must determine if the moving party is entitled to judgment as a matter of law. E.g., First Wisconsin Trust Co. v. Schroud, 916 F.2d 394, 398 (7th Cir.1990); Fed.R.Civ.P. 56(c).
 
 
 11
 Before proceeding, it is important to clarify the issue in this case by precisely defining the parties' positions. The defendants concede that when the DOC and state police officers shot Ruhl they "seized" him within the meaning of the Fourth Amendment and that the officers effected the seizure by the use of deadly force. Carter has not argued that once Ruhl began firing, the use of deadly force to seize him was unreasonable. Furthermore, Carter has not argued that the state police officers lacked probable cause to arrest her husband or used excessive force at any time during their encounter with him. Rather, relying on Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and Brower v. County of Inyo, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), Carter contends that the Fourth Amendment prohibits creating a foreseeably dangerous situation in which to arrest a suspect.
 
 
 12
 We conclude that Carter misapprehends Garner and Brower and the Fourth Amendment's reasonableness requirement. To reach this conclusion, we begin by reexamining at some length the Supreme Court's analysis in each of those cases.
 
 
 13
 In Garner, police officers shot a fleeing, apparently unarmed, felony suspect as permitted by a Tennessee statute. In reviewing the constitutionality of the statute as applied to the case, the Supreme Court began by noting that apprehension by deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. Garner, 471 U.S. at 7, 105 S.Ct. at 1699. Examining the reasonableness of that seizure, the Court rejected Tennessee's argument that once there is probable cause to arrest, the Fourth Amendment has nothing to say about how the seizure is made. Id. at 7-8, 105 S.Ct. at 1699. Rather, the Court pointed out that in prior cases it had focused on whether "the totality of the circumstances justified a particular sort of search or seizure." Id. at 9, 105 S.Ct. at 1700. As to the use of deadly force, the Court concluded:
 
 
 14
 Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.
 
 
 15
 Id. at 11-12, 105 S.Ct. at 1701.
 
 
 16
 In Brower, a fleeing suspect died when the stolen car he was driving at high speeds to elude the pursuing police crashed into an 18-wheel tractor-trailer set up as a deadman roadblock across both lanes of a two-lane highway. When the suspect's heirs brought a section 1983 action, the district court dismissed their claim based on the Fourth Amendment for failure to state a claim, holding that the roadblock was reasonable under the circumstances. Brower, 489 U.S. at 594, 109 S.Ct. at 1380. On appeal, the Ninth Circuit concluded that it need not consider the reasonableness of the roadblock because no "seizure" had occurred. Id. (citing 817 F.2d 540, 545-46). The Supreme Court reversed holding that there was a "seizure" when the fleeing suspect hit the roadblock. The Court noted that a roadblock is not just a show of authority to induce a voluntary stop "but is designed to produce a stop by physical impact if voluntary compliance does not occur." Id. 489 U.S. at 598, 109 S.Ct. at 1382. Even if the police would rather have had the fleeing suspect stop voluntarily, the Court reasoned, "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." Id. at 599, 109 S.Ct. at 1382. However, the Court noted that a "seizure" is not enough for section 1983 liability. Therefore, the Court remanded the case so the Ninth Circuit could review the district court's decision to dismiss the claim on the grounds that such a seizure by deadly force was "reasonable." Id. at 599-60, 109 S.Ct. at 1382-83.
 
 
 17
 On remand, the Ninth Circuit decided that the Fourth Amendment claim could not be dismissed for failure to state a claim. Assuming the roadblock was positioned as the plaintiffs alleged[2] and was the proximate cause of the decedent's death (as must be assumed when considering a motion under Fed.R.Civ.P. 12(b)(6)), the court applied the two-prong test set out in Garner. It reasoned that even if the "significant threat" prong of Garner were satisfied, there remained a question of fact as to whether a non-deadly alternative existed. Brower v. County of Inyo, 884 F.2d 1316, 1317-18 (9th Cir.1989). Therefore, the Ninth Circuit remanded the case to the district court for further proceedings since dismissal for failure to state a claim was improper unless it appeared to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved. Id. at 1318.
 
 
 18
 Contrary to Carter's contention, Garner and Brower do not suggest that the Fourth Amendment prohibits creating unreasonably dangerous circumstances in which to effect a legal arrest of a suspect. The Fourth Amendment prohibits unreasonable seizures not unreasonable, unjustified or outrageous conduct in general. E.g., Tom v. Voida, 963 F.2d 952, 956 (7th Cir.1992); Cameron v. City of Pontiac, 813 F.2d 782, 784 (6th Cir.1987). Therefore, pre-seizure conduct is not subject to Fourth Amendment scrutiny. Accordingly, in both Garner and Brower, the Supreme Court began its analysis by identifying the "seizure." Then the Court proceeded to examine (or, in the case of Brower, direct the lower court to examine) whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances. In Brower, for instance, the question on remand was whether it was reasonable to seize a fleeing suspect with a deadman roadblock, not whether it was reasonable to pursue the suspect in a high-speed car chase.
 
 
 19
 Conducting an analysis consistent with that in Garner and Brower, we find that the defendants' conduct did not violate the Fourth Amendment. The parties do not dispute that a seizure occurred. Like the Memphis police officer in Garner, Illinois DOC officer Heltsley unquestionably seized Ruhl by shooting him in the chest. Prior to that, however, no "seizure" occurred, not even when officer Bensyl flashed his light and announced "state police." "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Furthermore, a seizure requires not only that the reasonable person feel that he is not free to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police. California v. Hodari, --- U.S. ----, ----, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991); Tom, 963 F.2d at 957. Carter has not argued (and there is no indication in the record) that prior to shooting Ruhl, the state police officers physically restrained Ruhl or that Ruhl yielded to any show of authority. Quite to the contrary, when Bensyl announced "state police," Ruhl did not submit to Bensyl; he shot him. Shooting Ruhl, then, constitutes the only "seizure" we must scrutinize under the Fourth Amendment.
 
 
 20
 Was shooting Ruhl "reasonable" under the Fourth Amendment? We need not linger long on this question. Ruhl's shooting rampage threatened the lives of all the officers at the scene. Therefore, the rule in Garner unquestionably justified the use of deadly force to seize Ruhl.
 
 
 21
 Even if the defendants concocted a dubious scheme to bring about Ruhl's arrest, it is the arrest itself and not the scheme that must be scrutinized for reasonableness under the Fourth Amendment. This court recently reached a similar conclusion in Tom where an innocent encounter between a police officer and an eighteen-year-old, Wayne Tom, escalated into violence and ended in Tom's death. In a section 1983 action on Tom's behalf, the plaintiff argued that the defendant police officer created the need for deadly force by a series of constitutional violations. Tom, 963 F.2d at 956. The opinion analyzed each action taken by the defendant officer and concluded that she did not violate Tom's constitutional rights at any point. As part of that analysis, the opinion concluded that the officer's actions prior to "seizure," even if unjustified, were not subject to Fourth Amendment scrutiny. Id.[3]
 
 
 22
 Because we conclude there has been no Fourth Amendment violation, we need not reach the defendants' qualified immunity defense.
 
 Conclusion
 
 23
 For the reasons set forth above, we AFFIRM the district court's judgment.
 
 
 
 *
 Hon. William C. Lee, District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 Although the precise details of the pandemonium that ensued following Bensyl's announcement are somewhat in dispute, those disputes do not appear material to the issue in this case
 
 
 [2]
 The plaintiffs alleged that the roadblock consisted of an 18-wheel tractor-trailer across both lanes of a two-lane highway in the path of Brower's flight, that it was "effectively concealed" because it was placed around a curve and was unilluminated, and that the police positioned a police car, with its headlights on, between Brower's oncoming car and the tractor-trailer, so that Brower would be "blinded" upon his approach. The plaintiffs further alleged that the fatal collision was the proximate result of the police roadblock. Brower, 109 S.Ct. at 1380
 
 
 [3]
 Since the Tom court did not find that any constitutional violations occurred in the series of events leading to the shooting death of the teenager, it did not address the question of whether a series of constitutional violations could render "unreasonable" the eventual use of deadly force even if that use of force in and of itself was justified. Tom, 963 F.2d at 956. Similarly, we do not address this question. But see Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir.1985) (en banc), cert. denied, 476 U.S. 1115, 1124, 106 S.Ct. 1970, 1993, 90 L.Ed.2d 654 (1986) (when an officer improperly beat the suspect-decedent, the officer's improper use of power created the need to use deadly force when the suspect retaliated, and the officer could be held liable for shooting the suspect in spite of the officer's legitimate fear at the time of the shooting)