**Jo Ann PLAKAS, individually and as Administrator of the Estate of Konstantino N. Plakas, deceased, Plaintiffs,**

v.

**Jeffrey DRINSKI, in both his individual and official capacity and Newton County, Indiana, a municipal unit of government, Defendants.**

Civ. No. H91–365.

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 15, 1993.

Thomas E. McClure, Elliott & McClure, P.C., Bourbonnais, IL, for plaintiffs.

Daniel C. Blaney, Blaney, Casey and Walton, Morocco, IN, Colleen C. Coburn, Elizabeth A. Knight, Knight, Hoppe, Fanning & Knight, Des Plaines, IL, for defendants.

## ORDER

LOZANO, District Judge.

This matter is before the Court on Motion for Summary Judgment, filed August 24, 1992, by Defendant, Jeffrey Drinski ("Drinski"), and Motion for Summary Judgment, filed October 21, 1992, by Defendant, Newton County, Indiana ("Newton County"). For the reasons set forth herein, Drinski's Motion for Summary Judgment is GRANTED, and Newton County's Motion for Summary Judgment is GRANTED.

## BACKGROUND

Plaintiff Jo Ann Plakas ("Plaintiff"), individually and as Administratrix of the Estate of Konstantino N. Plakas ("Plakas"), purportedly states claims under 42 U.S.C. § 1983 against Newton County and Drinski, one of its police officers. Drinski's Motion for Summary Judgment argues that as a matter of law, he did not violate the Fourth or Fourteenth Amendment rights of Plaintiff or Plakas and there is no genuine issue of material fact as to the reasonableness of the force Drinski used against Plakas. Alternatively, Drinski argues that he is entitled to qualified immunity. Newton County argues that it is entitled to summary judgment on the ground that there is no constitutional violation. Alternatively, Newton County argues that as a matter of law Drinski was adequately trained in the lawful use of a firearm and in the use of deadly force.

The facts in this case are either undisputed, or are those presented by the Plaintiff, the nonmovant. The facts are

derived from the numerous depositions and affidavits in this case.[1]

On Saturday, February 2, 1991, at about 11 p.m., Plakas was fatally shot by Newton County Deputy Sheriff Jeffrey Drinski. The events which led to this shooting are as follows: Around 9:30 p.m. that night two Newton County Deputy Sheriffs, Corporal David Koby and Sergeant Buddy King, as well as Lake Township Volunteer Fire Department members, Glenn Cain and Stephen Whitt, responded to a call regarding an auto accident on State Road 10. Upon arriving at the scene, the men found Plakas' car in a deep ditch filled with water. The car left the north side of the road and came to rest in the ditch.

Cain found Plakas walking along State Road 10 and stopped to speak with him. Plakas stated that he was the driver of the car found in the ditch, and that he was fine, except that he was cold. Plakas was not injured and was not in need of medical treatment. However, he got in Cain's vehicle and rode west about one mile to the accident scene.

At the scene of the accident, Cain told Officer Koby to check Plakas for intoxication since he could smell alcohol on Plakas' breath and Plakas was dozing off. Plakas signed a waiver of medical treatment after being examined by the Newton County Ambulance Service, and told Koby he would go to the Sheriff's Department for a breathalyzer test. Koby patted down Plakas, then handcuffed him behind his back, and directed him to get into the rear of the squad car to be transported to the county jail for a breathalyzer test. Plakas claimed that being cuffed behind the back would injure his chest, which had extensive scar tissue from a childhood burn. Koby cuffed Plakas behind the back, ignoring his request to be cuffed in front.

As Koby drove towards the jail he heard a noise from the back seat as if one of the car doors had opened. Fearing that Plakas would jump out of the car as it was moving, Koby pulled his squad car off the road and stopped. The back door flew open and Plakas jumped out and started running across a field. Koby radioed that Plakas had escaped from Koby's vehicle two to four miles east of the accident site. The message was heard by Cain and Whitt of the fire department, King and Drinski of the Sheriff's office, and State Trooper Lucien Perras. Cain arrived at the scene and helped Koby search for Plakas in a field north of State Road 10.

Roy and Joyce Ailes lived in a house at the end of a long driveway to the north of State Road 10. Plakas had been dating their daughter, Rachael Ailes, for about four years, and they were engaged to be married. On February 2, 1991, at around 10 p.m., Plakas arrived on the doorstep of the Ailes' home. Joyce Ailes opened door to let Plakas in and he fell through the front door into her living room. Plakas was handcuffed behind the back. Plakas stated that he'd wrecked his car and that he needed help. Joyce Ailes was under the

---

1. In her response to Drinski's Motion for Summary Judgment, Plaintiff argues that the Indiana Dead Man's Statute, Ind.Code Ann. § 34–1–14–6 (West 1983), bars Drinski and fellow officers, Buddy King, David Koby, and other deputies, officers, and employees of Newton County, Indiana from testifying to any statements or occurrences which took place in the presence of the decedent, Plakas.

Rule 601 of the Federal Rules of Evidence provides that, "in all civil actions and proceedings, with respect to element of claim or defense as to which state law applies the rule of decision, the competency of a witness shall be determined in accordance with state law." Fed. R.Evid. 601. Counts One and Two of Plaintiff's Complaint are brought pursuant to 42 U.S.C. § 1983, alleging violation of Plakas' rights under the Fourth and Fourteenth Amendments to the United States Constitution. As both Counts One and Two are wholly founded in federal law, Plaintiff's reliance on the Indiana Dead Man's Statute is completely misplaced and wholly inappropriate. The plain and obvious language of Rule 601 states that "every person is competent to be a witness" except where state law supplies the rule of decision, the competency of a witness will be determined in accordance with state law. Fed.R.Evid. 601. As no Indiana law supplies any rule of decision in this matter, the Indiana Dead Man's Statute does not apply, and Drinski, as well as other officers, deputies and employees of Newton County are competent to testify in this matter. See e.g., *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1051 (7th Cir.), *cert. denied*, 433 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977); *Donaldson v. Hovanec*, 473 F.Supp. 602, 610 (E.D.Pa.1979).

impression that Plakas had multiple lumps to the head and bruises to his legs. It appeared that he was in need of medical attention and was blacking out because of head injuries.

Roy Ailes entered the living room and spoke to Plakas. Plakas kept stating that he didn't do anything wrong. From his living room, Mr. Ailes could see the lights from the police cars on State Road 10. He told Plakas that he could not run from the police and he would help straighten things out. Plakas agreed that Roy Ailes should go talk to the police. Ailes drove to where the officers were, and advised Cain that Plakas was at his house and was willing to come out to talk to them. Ailes directed the officers to his home. Koby, Drinski, and Cain then drove to Mr. Ailes' home. Cain approached the front door of the house to see if Plakas needed medical treatment. He observed Plakas in the process of sliding his arms beneath his buttocks and legs in order to bring his handcuffs in front of him. Cain entered through the front door with Koby behind him. Drinski went to watch the back door of the house.

As soon as Cain and Koby entered the house, Plakas began screaming. He was standing in a corner of the Ailes' living room with his hands now cuffed in front of him. Plakas' demeanor went from calm to upset at the sight of the uniformed fireman and police officer. When Koby entered the house the tension escalated and Plakas began shouting, screaming, and swearing that Koby had hurt him and that Koby would not touch him. Plakas then backed into the corner of the living room and as he backed up he bumped the fireplace tools, reached down and picked up the poker. The fireplace poker was two to three feet long with a hook on the end. Plakas gripped it like a baseball bat as he screamed at Cain and Koby. Several minutes after Plakas picked up the poker he rushed at Officer Koby and swung the poker like an axe at Officer Koby's head. Officer Koby threw his left hand up to protect his head and Plakas hit him on the wrist with the poker. Officer Koby fell into the door and ran out of the house.

Officer Koby never drew his gun while in the house.

Plakas then chased Cain with the poker. Cain ran up through a stairway two or three stairs into the kitchen to avoid also being hit with the poker. To avoid Plakas, Cain ran through the house and out into the garage. Having heard the scuffle, Drinski came around to the front of the house and around the same time, Sergeant King and Trooper Perras arrived on the scene. Drinski and Perras then entered the house through the garage door with their guns drawn. As they entered, they saw Plakas run out of the front door of the house. Plakas stopped in the yard after running out of the house. The police officers drew their guns and Mr. Ailes jumped between the police officers and Plakas. Ailes tried to get Plakas to put the poker down and surrender. As Ailes talked to Plakas, Plakas slowly backed down a hill in the Ailes' yard. For a moment it seemed that he might put down the poker and surrender. However, as police moved in behind Mr. Ailes, Plakas turned, tripped over a wire fence, and ran to the north through a nearby open field with Officers King and Drinski, as well as State Trooper Perras in pursuit. The police officers continued to yell, "Stop, police." Plakas was still cuffed in front, palm to back of hand, holding the fireplace poker. The officers had no trouble keeping up with Plakas. It was a clear night, the moon was bright, the snow on the ground further illuminated the field, and the officers had no problem seeing Plakas.

As Plakas entered some thick brush, he slowed down. The officers had their guns drawn and their flashlights trained on Plakas. After moving through the brush, Plakas entered a clearing. Drinski and Perras followed Plakas into the clearing, maintaining a distance of at least ten feet from him, while King stayed on the outside of the brush. Plakas crossed the clearing and stopped and faced the officers when he reached the heavy brush on the far east side. For the next several minutes, the officers kept their distance and tried to convince Plakas to surrender. Plakas attempted to break through the brush behind

him and leave the clearing, but the brush was too thick. The officers continued to talk to Plakas, telling him that he should surrender and that he would get himself in more trouble if he didn't. Plakas stated that his life wasn't worth living and that he was going to kill both officers, or they would have to kill him. He carried the poker like a baseball bat in front of him, moving it around some. At all times, Drinski was directly in front of Plakas, and Perras remained five to seven feet to the left of Drinski. The officers continued to talk to Plakas for a few minutes, but were unable to calm him down. Again, Plakas stated that his life wasn't worth living, and that the officers would have to kill him, or he would attempt to kill them both. He then raised the poker like a baseball bat and lunged toward Drinski. Drinski took a step back, and nearly fell down as he fired a single shot which struck Plakas mid-chest. Plakas subsequently died of this wound.

Plakas' mother, the Administratrix of his estate, has filed suit under 42 U.S.C. § 1983 against Drinski and Newton County to recover damages in connection with her son's death. She alleges that her son was armed with only a fireplace poker and posed no serious threat to the safety of Drinski or others. She alleges that Drinski and Newton County violated her son's rights under the Fourth and Fourteenth Amendments, "to be secure in his person, to be free from the use of deadly force, to be free from punishment without due process of law, and to equal protection of the laws." (Plaintiff's Amended Complaint at ¶ 14) She also claims that her own rights to parenthood and association under the Fourteenth Amendment, were infringed. (Plaintiff's Amended Complaint at ¶ 15)

DISCUSSION

■ Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d

265 (1986); *First Wis. Trust Co. v. Schroud,* 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir. 1991); see also *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Richardson v. Penfold,* 839 F.2d 392, 394 (7th Cir.1988).

■ The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo,* 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson,* 477 U.S. at 250–252, 106 S.Ct. at 2511–12).

■ "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be

" 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (1986).

## Drinski's Motion for Summary Judgment

Drinski first argues that he is entitled to summary judgment because a reasonable jury could reach only one conclusion, based upon the evidence, that a reasonable police officer at the scene would have acted as Drinski did. He contends, therefore, that a trial would be useless.

The United States Supreme Court in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), held that claims of excessive force in the course of arrest or other seizure must be analyzed under the Fourth Amendment's "objective reasonableness" standard. The Court looks to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872; *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir.1992).

The use of deadly force will be deemed objectively reasonable "where the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12, 105 S.Ct. at 1701. The existence of probable cause is a question for the jury only "if there is room for a difference of opinion." *Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988). Additionally, it is imperative that in determining the reasonableness of the officer's conduct, the focus is on the very moment when the officer makes the "split

second judgments", *Graham v. Connor*, 490 U.S. at 397, 109 S.Ct. at 1872, which led to the use of deadly force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* (citations omitted).

In *Ford v. Childers*, 855 F.2d 1271 (7th Cir.1988), two police officers shot a fleeing bankrobber whom they believed might be armed. The Seventh Circuit affirmed the district court's grant of a directed verdict in favor of the defendant police officers, holding that "a reasonable jury could only conclude that Officer Childers had probable cause to believe that Ford posed a threat of serious physical harm to himself and/or to others." 855 F.2d at 1276. Thus, the court held that the officer's actions under the circumstances were objectively reasonable as a matter of law. *Id.* The court reasoned that although the officer, at the time he shot Ford, did not know that Ford was armed, given the information that he possessed at the time, and the observations that he made, the officer reasonably concluded that Ford was armed and dangerous. *Id.* at 1275. The court stressed that under the Fourth Amendment, the constitutionality of the officer's action was not judged with hindsight, but only by "an examination and weighing of the information [he] possessed immediately prior to and at the very moment he fired the fatal shot." *Id.* (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir.1988)).

The Seventh Circuit most recently addressed the use of deadly force to effectuate an arrest in *Carter v. Buscher*, 973 F.2d 1328 (7th Cir.1992). There, five law enforcement officers concocted a scheme for arresting a man suspected of plotting the murder of his wife. Concerned that

the suspect was usually heavily armed, especially in his home, the officers decided they would lure the suspect to a highway roadside, where officers pretending to be stranded motorists would effectuate his arrest. The plan went awry, as one of the impatient officers announced that he was a policeman. The suspect immediately shot and killed one of the officers and fired at least four shots at another officer, who was shot and injured. One of the other officers then shot the suspect in the chest with a single twelve-gauge shotgun slug, which killed him. Acting as the administratrix of his estate, his wife sued the officers, charging that their scheme to arrest him had "provoked a situation whereby unreasonable deadly force was used in the attempt to seize his person in violation of the Fourth Amendment...." *Carter v. Buscher,* 763 F.Supp. 392, 394 (C.D.Ill. 1991). The district court granted summary judgment for the defendants, holding that the use of deadly force was reasonable as a matter of law:

> In the case at bar, there is no question that the police seized Ruhl by the use of deadly force. However, there is also no question that, as a matter of law, the seizure was reasonable. As recognized by *Garner,* the police are authorized to use deadly force to apprehend a felon where they have probable cause to believe the felon poses a risk of serious harm to the officers or others. The state police and corrections officers did not use deadly force until Ruhl had killed agent Bensyl and shot agent McLearin three times. Clearly, they had probable cause to believe that their lives were in danger if they did not return Ruhl's fire.

763 F.Supp. at 396.

The Seventh Circuit affirmed the summary judgment entered below, agreeing that the use of deadly force was unquestionably justified. Furthermore, the court rejected the appellant's contention that the Fourth Amendment prohibits creating a foreseeably dangerous situation in which to arrest a suspect. Simply put, the court held that "pre-seizure conduct is not subject to Fourth Amendment scrutiny." 973 F.2d at 1332. "Even if the defendants concocted a dubious scheme to bring about Ruhl's arrest, it is the arrest itself and not the scheme that must be scrutinized for reasonableness under the Fourth Amendment." *Id.* at 1333.

■ The undisputed facts in this case are that Plakas was armed with a two to three foot steel rod with a hook on the end of it. He had already assaulted one officer with this weapon. He evaded arrest, fled from the police, and claimed that he would not be taken alive. After speaking to Plakas for almost thirty minutes, Drinski and Perras were unable to calm Plakas or get him to surrender. He claimed that he would kill them both or that they would have to kill him. Finally, Plakas lunged at Drinski with the fireplace poker in front of him. As a matter of law, there can be no other conclusion but that Plakas threatened Drinski with a weapon intending to inflict serious physical harm. *Garner,* 471 U.S. at 11–12, 105 S.Ct. at 1701–02. Under these circumstances, this Court holds that a reasonable jury could only conclude that Drinski had probable cause to believe that Plakas posed a threat of serious physical harm to himself and/or to others. *Ford,* 855 F.2d at 1276. Thus, Drinski's split-second decision to use deadly force to protect himself was objectively reasonable as a matter of law, and under these circumstances there can be no violation of the Fourth or Fourteenth Amendments.

This Court rejects the arguments and intimations made by Plaintiff that Drinski was under a legal obligation to either let Plakas escape, or to effect his arrest by less provocative means. That Trooper Perras had with him a canister of teargas and that a canine unit could have been summoned within thirty minutes, are immaterial to the inquiry of whether the force used to seize Plakas was reasonable. Our jurisprudence does not require this Court to inquire what other means are available to effectuate this seizure. The relevant inquiry is only whether at the time deadly force is used, whether the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others. *Garner,* 471 U.S. at

11–12, 105 S.Ct. at 1701–02. As this remains the test employed by federal courts, all other inquiry is immaterial.

Accordingly, this Court hereby GRANTS Drinski's Motion for Summary Judgment, as Drinski's actions under the circumstances were objectively reasonable as a matter of law.

*Newton County's Motion for Summary Judgment*

Since this Court holds that Drinski acted reasonably under the circumstances, it follows that Newton County, as his employer, cannot be held liable to Plakas, as its liability was dependent upon the unreasonableness of Drinski's actions. Because Drinski did not violate Plakas' constitutional rights, there is no basis for liability against Newton County. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that department regulations might have authorized the use of constitutionally excessive force is beside the point.") *See also Tom v. Voida*, 963 F.2d 952, 962 (7th Cir.1992); *Ford v. Childers*, 855 F.2d at 1276–1277.

Accordingly, this Court hereby GRANTS Newton County's Motion for Summary Judgment.