**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

LARRY CHIDESTER; LAWRENCE
CHIDESTER; EMILY CHIDESTER,

Plaintiffs-Appellees,

v.

UTAH COUNTY; SHAUN BUFTON,

Defendants,

and

JASON PARKER; R.A. DEKE
TAYLOR,

Defendants-Appellants.

No. 06-4255
(D.C. No. 2:05-CV-624-DB)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**TYMKOVICH**, Circuit Judge.

---

[*]      After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.  This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel.  It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

On May 25, 2005, the Utah County Metro SWAT Team, executed a search warrant on a house in Springville, Utah ("target residence").[1] The plaintiffs in this case–Lawrence and Emily Chidester and their adult son Larry Chidester–lived next door to the target residence. During the raid, defendant Jason Parker, a "[r]eserve deputy" with the Utah County Sheriff's Office, Aplt. App. at 123, tackled and injured Larry Chidester who was standing outside his home. Defendant R.A. Deke Taylor, a sergeant with the Sheriff's Office and another law enforcement officer entered the Chidester home and detained Lawrence and Emily Chidester. The Chidesters filed suit against Deputy Parker and Sergeant Taylor and other defendants under 42 U.S.C. § 1983 alleging that the incident violated their rights under the Fourth Amendment. The defendants moved for summary judgment. Deputy Parker and Sergeant Taylor argued that they should be granted summary judgment on the ground that they were entitled to qualified immunity from suit. The district court denied summary judgment in favor of Deputy Parker and Sergeant Taylor but granted summary judgment as to the other defendants. The officers appeal the denial of summary judgment.

---

[1] Deputy Parker testified that he "fill[ed] in for the regular, full-time deputies who are either sick [or] take vacation." Aplt. App. at 123. "SWAT" stands for "Special Weapons and Tactics." The Random House College Dictionary 1326 (Rev. ed. 1988).

I.

We must first consider whether we have jurisdiction to hear this appeal.

Generally, denials of summary judgment are not immediately appealable.

*Blossom v. Yarbrough*, 429 F.3d 963, 966 (10th Cir. 2005). But Deputy Parker

and Sergeant Taylor claim that they are immune from suit under the doctrine of

"qualified immunity," which operates to "shield[] government officials from suits

for civil damages 'insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have

known.'" *Lawrence v. Reed*, 406 F.3d 1224, 1230 (10th Cir. 2005) (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We have held that

> [b]ecause a government official's qualified immunity provides, not
> simply a defense to liability, but a right not to stand trial in the first
> place, a district court's decision denying a government official
> qualified immunity, to the extent it turns on an issue of law, is an
> immediately appealable final collateral order. Thus, this court has
> jurisdiction to review purely legal questions that arise from the
> denial of qualified immunity.

*Kirkland v. St. Vrain Valley Sch. Dist. No. RE-1J*, 464 F.3d 1182, 1188 (10th Cir.

2006) (citation and quotation omitted).

In the first point on appeal, Deputy Parker argues that Larry Chidester's

version of the facts, taken in the light most favorable to Mr. Chidester, fails to

show that the deputy's actions violated Mr. Chidester's constitutional rights under

the Fourth Amendment. He argues in the second point that even if his actions

violated Larry Chidester's constitutional rights, those rights were not clearly

established at the time of the incident. "When, as here, a defendant's appeal of the denial of a motion for summary judgment is based on the argument that, even under the plaintiff's version of the facts, the defendant did not violate clearly established law, then the district court's summary judgment ruling is immediately appealable." *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 841 (10th Cir. 2005) (quotation omitted).

The final point on appeal contests the denial of summary judgment to Sergeant Taylor. He "concedes [for the purposes of appeal] that Plaintiffs' Complaint sufficiently alleges the violation of [their] constitutional right" to be "free of warrantless entries into their home" and that this right "was clearly established at the time of the conduct in question." Aplt. Opening Br. at 47. Nevertheless, Sergeant Taylor argues that *as a matter of law*, the district court was required by local rule to consider it an admitted fact that he thought that he was pursuing a suspect from the target residence when he entered the Chidester home. We agree that this is also a purely legal question that we have jurisdiction to address.

II.

Viewed in the light most favorable to the plaintiffs, the following occurred at approximately 10:30 p.m. on May 25, 2005. The SWAT Team was preparing to serve its warrant on the target residence, which was located on the west side of South State Street which runs north and south. The warrant, which authorized a

nighttime no-knock entry, directed the officers to search the target residence for methamphetamine and weapons, among other items. The Chidesters' house is also located on the west side of South State Street, directly to the north of the target residence. Directly to the north of the Chidesters' house on the same side of the street is a commercial building. The SWAT team was divided into four groups for the raid, Sierra Team, Alpha Team, Bravo Team, and Charlie Team. The members of all of the teams were equipped with radio headsets to enable them to communicate with one another.

Sierra Team was the first to arrive at the raid site and was composed of three two-man sniper teams. Sierra Team arrived at the raid site well before the other teams and took up positions approximately fifty yards from the target residence. The job of Sierra Team was to provide intelligence prior to the arrival of the other teams, to provide cover to the entry teams as they moved into position, and to observe the exits of the target residence.[2] Two of the sniper teams were located east of the target residence in a field on the other side of State Street. Their assignment was to cover the east side (or front) of the residence. The third sniper team was located off the south-west corner of the residence, covering both the west side (or rear) and south side of the residence.

Alpha Team and Charlie Team were composed of eight members each. Alpha Team's main job was to breach the east or front door of the target

---

[2]     The target residence had doorways on its east, west, and south sides.

residence. Deputy Parker and Sergeant Taylor were members of Alpha Team. In addition, two officers were to serve as a perimeter team, taking up positions on the north-east and south-east corners of the target residence in order to observe the east and north sides of the house.[3] Charlie Team's job was to breach the south door. Alpha and Charlie teams arrived at the raid site in a SWAT van that was parked on State Street in front of the commercial building to the north of the Chidester residence. The van with the two teams inside was facing south, approximately seventy yards from the target residence and fifty yards from the Chidester residence. This was their "final assault point" (FAP). Aplt. App. at 63.

Bravo Team was composed of nine members. Bravo Team's main job was to breach the west or rear door of the target residence. In addition, two officers were to serve as a perimeter team, taking up a position off the north-west and south-west corners of the target residence in order to observe the west and north sides of the house.[4] Bravo Team's FAP was located behind a wooden fence in the backyard of the target residence approximately fifty yards from the rear entrance.

The plan was for Bravo Team to give a "30-seconds-out" signal over the radio, *id.* at 78, to alert Alpha and Charlie Teams that it would be deploying its flash-bang grenades and breaching the rear entrance of the target residence in

---

[3]     The record is not clear as to whether the perimeter teams were separate from or a part of Alpha Team.

[4]     Again, the record is not clear as to whether the perimeter teams were separate from or a part of Bravo Team.

thirty seconds. Alpha and Charlie Teams were to then exit the rear of the van and line up in two lines or "sticks," *id*. at 89, facing south toward the target residence, with Charlie Team's stick closest to the van. The sticks were then to approach the target residence together so that they could deploy their own flash-bang grenades and breach the east and south entrances of the target residence simultaneously with Bravo Team's breach. The timing of the three teams, however, was off.

Bravo Team approached the target residence and deployed its flash-bang grenades. At least one grenade was deployed by the perimeter team member assigned to the north-west corner of the house. Entry was made immediately after the grenades were deployed. At the time the Bravo Team's flash-bang grenades were deployed, however, Alpha and Charlie Teams had advanced only five to eight feet toward the target residence. Hence, they were still approximately sixty-five yards from the target residence and forty-five yards from the Chidester home. At that point the two teams started running towards the target residence.

At the time Bravo Team deployed its flash-bang grenades, Larry Chidester was asleep with one of his children in the basement of his residence.[5] Awakened by Bravo Team's flash-bang grenades, he ran out the door of the basement and up

---

[5] Lawrence and Emily Chidester lived on the main floor of the house. Larry Chidester lived in the basement apartment with his girlfriend and their two children.

a set of outside stairs to ground level.[6]  The basement door and stairs are located

on the north side of the Chidester home and exit onto a gravel driveway that runs

between the house and the commercial building next door.  There is another door

also on the north side of the home that led to the main floor.  When he got to the

top of the stairs, Larry Chidester saw the members of Alpha and Bravo Teams

running down State Street in front of his house.  He started to turn to go back

inside when heard one of the officers yell, "There's one."  *Id*. at 145.  At that

point he saw Deputy Parker running towards him from sixty to seventy feet away,

pointing his automatic weapon at him.[7]  Deputy Parker yelled at Mr. Chidester,

who was standing six to eight feet from the top of the stairs, to put his hands in

the air and he complied.  Deputy Parker then starting yelling at Mr. Chidester to

get on the ground.  Each time Mr. Chidester tried to get on the ground, Deputy

Parker would yell at him to keep his hands in the air.  Mr. Chidester testified that

he was yelling "I'm not resisting, I'm not resisting," and had his hands in the air

during the time that it took Deputy Parker to cover the sixty to seventy feet

between them.  Deputy Parker then tackled Mr. Chidester, knocking the wind out

of him.  He put Mr. Chidester face down in the rocks and dirt with his knee in the

---

[6]     Mr. Chidester's child evidently slept through the entire incident.

[7]     One of the members of the SWAT team testified that his equipment on the raid included a camouflage tactical uniform with soft body armor, a load-bearing vest, a hood, glasses, gloves, and a Kevlar tactical helmet, and that he was armed with a fully-automatic .223 caliber carbine rifle.  A jury could infer that Deputy Parker was similarly outfitted.

middle of his back and his hand pressing his face in the dirt. Deputy Parker kept

Mr. Chidester, who testified that he could barely breathe and thought he was

going to die, on the ground for "a minute or so," Aplt. App. at 148, until

Mr. Chidester told him who he was and where he lived. Deputy Parker then

proceeded on to the target residence.

Sergeant Taylor, who was in front of Deputy Parker in the stick heard

Deputy Parker yelling commands and identifying himself as a law enforcement

officer and turned and saw that Deputy Parker had left the stick and was

approaching the Chidester house.[8]

After Deputy Parker tackled Larry Chidester, Sergeant Taylor kicked in the

door to the main floor of the Chidester residence and he and another officer

entered the house. According to the Chidesters, neither officer identified himself

as a member of law enforcement prior to entering the house. After entering,

Sergeant Taylor encountered Emily Chidester, who had also heard the flash-bang

grenades and was headed toward the door because she also heard the sounds of

her son's encounter with Deputy Parker. The sergeant pointed his weapon at her

---

[8] Although at this stage we are required to view the evidence in the plaintiffs' favor, we note that Deputy Parker and Sergeant Taylor both testified that they saw Larry Chidester and another man emerge from the west side of the house, that they thought that the men might have come from the target residence, and that while Deputy Parker was able to keep Larry Chidester in view the entire time and take him to the ground, the other man disappeared. Deputy Parker testified that his only command to Larry Chidester was to get on the ground, that he received no response from Mr. Chidester, and that he tackled Mr. Chidester as he was turning away as if to flee.

and told her to get on the ground, which she did. Lawrence Chidester then entered the room and Sergeant Taylor ordered him to the ground as well. When Lawrence Chidester told Sergeant Taylor that he was putting on his pants, Sergeant Taylor grabbed him and put him on the floor, ripping his shirt. The only response the officers gave to Mr. and Mrs. Chidester's questioning regarding what was going on was to say they had a search warrant. When Mrs. Chidester stated that the officers were in the Chidester residence, they left. Larry Chidester then came in the house and shortly thereafter another officer came in the house and told the Chidesters that he was sorry for what had occurred and that the officers had the wrong house.

Mr. Chidester testified that he suffered cuts on his nose and forehead and scrapes on his shoulder, back, and knees, and testified that he had experienced some back pain since the incident. Mr. Chidester refused medical assistance at the scene but eventually went to a hospital to be examined. The emergency room report reflects that Mr. Chidester had bruising and abrasions on his nose and shoulder. The diagnoses was cervical and shoulder strains, a shoulder abrasion, and thoracic back pain.

## III.

We review de novo the denial of a summary judgment motion raising qualified immunity questions. Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions. After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, and the plaintiff must first establish that the defendant's actions violated a constitutional or statutory right.

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . .

. . . .

If a favorable view of the facts alleged show[s] the violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Applying the same standards as the district court, we must determine whether the plaintiff has satisfied this heavy two-part burden. If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity.

*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185-86 (10th Cir. 2001)

(citations and quotations omitted).

-11-

IV.

Our first task is therefore to determine whether the facts, viewed in the light most favorable to Larry Chidester, show an unlawful seizure or the use of excessive force.

"[T]he Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quotation omitted). The encounter between Deputy Parker and Mr. Chidester was clearly not consensual. Nor was it what is traditionally considered an "arrest" because the encounter was brief, no handcuffs were used, and Mr. Chidester was neither confined in a law enforcement vehicle nor taken from the scene. Nevertheless,

> [i]t is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime–"arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

*Terry v. Ohio*, 392 U.S. 1, 16 (1968). This encounter was, at least at its inception, an investigative detention, or *Terry* stop, which "is a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." *Cortez*, 478 F.3d at 1115 (quotation omitted).

We engage in a two-step inquiry to determine whether Deputy Parker's actions during this investigative detention amounted to an unlawful seizure.

-12-

First, we must ascertain whether the detention was justified at its inception. For a detention to be valid, the officer must have an articulable suspicion that a detainee has committed or is about to commit a crime. Neither inarticulate hunches nor unparticularized suspicion will suffice to justify an investigatory detention. However, in determining the reasonableness of an investigative detention, common sense and ordinary human experience must govern over rigid criteria. The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances.

*Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997) (citations and quotations omitted).

We believe this detention was justified at its inception. The SWAT team was in the process of serving a search warrant and suspected that multiple individuals, methamphetamine, and weapons would be found at the target residence. Even if a jury were to find that Deputy Parker lied when he testified that he saw Mr. Chidester and another man emerge from the back of the house, the deputy was still confronted with an unidentified person in the area of the target residence.[9] Further, at the district court hearing on defendants' motion for summary judgment, plaintiffs' attorney agreed that it was reasonable for Deputy

---

[9] While a reasonable jury could believe that the Chidesters were at some point told by the officers that they had the wrong house, we do not believe any reasonable jury could find that Deputy Parker confused the Chidester house and the target residence. Even not considering the pre-raid briefing that the SWAT team members went through, Deputy Parker would have known that the other members had continued on to another house. Further, he knew that Bravo Team had already deployed its flash-bang grenades. It would have been obvious that the grenades were not deployed at the Chidester house, that Bravo Team had not entered that house, and that the other members of Alpha and Charlie Teams were proceeding to a different location.

Parker to break away from the stick to stop Mr. Chidester and determine who he was and what he was doing, arguing only that the deputy violated the Fourth Amendment by obtaining this information in the manner that he did.

We therefore proceed to "[t]he second step in determining the reasonableness of an investigative detention[, which] consists of determining whether the officers' actions are reasonably related in scope to the circumstances which justified the interference in the first place." *Gallegos*, 114 F.3d at 1028 (quotation omitted). In other words, we must determine whether Deputy Parker's actions changed the detention from one requiring only that he have an "articulable suspicion" that Mr. Chidester had committed a crime, into one requiring the more stringent standard of probable cause, which the deputy clearly did not have. Here, we don't think that line was crossed. We have said that "'[a]n encounter between police and an individual which goes beyond the limits of a *Terry* stop . . . may be constitutionally justified only by probable cause or consent.'" *Id*. at 1029 (quoting *United States v. Perdue*, 8 F.3d 1455,1462 (10th Cir. 1993)). We have also said that "an arrest is distinguished by the involuntary, highly intrusive nature of the encounter. The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Cortez*, 478 F.3d at 1115-16 (citations and quotations omitted). Nevertheless, officers may use some force without probable cause.

Although *Terry* stops are normally non-intrusive, we have indicated that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause. At the same time, an unreasonable level of force transforms a *Terry* detention into an arrest requiring probable cause.

*Id.* at 1130 (citation and quotation omitted). Here, however, we do not think that the tackling of Mr. Chidester transformed the investigative detention into a detention requiring probable cause. It is clear from the record that the only purpose for the encounter was to determine who Mr. Chidester was. No handcuffs were used, Mr. Chidester was not removed from the scene, and the encounter was very brief.

Nevertheless, even if the deputy's actions did not constitute an unlawful seizure, we must consider the separate issue of whether he used excessive force during the seizure. *See Cortez*, 478 F.3d at 1127 n.22 (confirming that unlawful seizure and excessive force claims are separate claims). While "[t]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," that degree "is not unlimited." *Cortez*, 478 F.3d at 1125 (quotation omitted).

Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application its proper application requires careful attention to the facts and circumstances of each particular case, including the

-15-

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*. (quotation and omitted). "'Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop.'" *Gallegos*, 114 F.3d at 1028-29 (quoting *Perdue*, 8 F.3d at 1462) (further quotation omitted).

"[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

*Cortez*, 478 F.3d at 1125 (quoting *Graham*, 490 U.S. at 396-97). Finally, determining the objective reasonableness of Deputy Parker's actions is, in this context, a legal determination. *See Mecham v. Frazier*, 500 F.3d 1200, 1203-04 (10th Cir. 2007) (holding that, in the context of a motion seeking summary judgment on an excessive force claim due to qualified immunity, the question of "[w]hether [an officer] acted reasonably . . . is a legal determination in the absence of disputed material facts" (emphasis omitted)).[10]

---

[10] Although Deputy Parker disputes the Chidesters' version of the evening's events, his argument necessarily is that he is entitled to qualified immunity even under that version.

-16-

Here, we believe that, viewed objectively, Deputy Parker's tackling of Mr. Chidester was not reasonably necessary to protect his personal safety and maintain the status quo. It is an exceedingly close case.

We recognize that "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation.'" *Cortez*, 478 F.3d at 1125 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). Here, the SWAT team was conducting a raid on a household that they expected to contain weapons and Deputy Parker was confronted with an unknown person as he was beginning to run to the target residence. Viewed objectively, a reasonable officer would not know who Mr. Chidester was, whether he might be coming from or going to the suspect house, and whether or not he might be armed. Thus, Mr. Chidester clearly presented some threat, and Deputy Parker had to make a split second decision in uncertain light, and the stress involved was certainly heightened by the SWAT team's realization that the timing of their plan was compromised.

On the other side of the ledger, however, Deputy Parker encountered Mr. Chidester very quickly after Bravo Team deployed their flash-bang grenades. Mr. Chidester was standing on the other side of the Chidester residence from the target residence, not running or even walking. Despite the fact that there were

three sniper teams observing the residence, the fact that there was a two-man perimeter team responsible for securing the rear and north side of the target residence, and the fact that the SWAT members were wearing radio headsets, no deposed SWAT member could recall seeing anyone leave the target residence or hearing a report of anyone leaving the target residence immediately prior to or during the raid. It is clear from the record that the SWAT team was aware of the existence and occupation of the Chidester residence prior to the raid. Mr. Chidester did not resist arrest or attempt to flee, put his hands in the air when ordered to by Deputy Parker, and kept them in the air the entire time while yelling that he wasn't resisting. When Mr. Chidester tried to comply with Deputy Parker's order to get on the ground, he felt Deputy Parker prevented him from doing so by ordering him to keep his hands up. Mr. Chidester testified that he was a smaller man than Deputy Parker and the record is clear that the deputy had his automatic weapon pointed at Mr. Chidester. Nevertheless, Deputy Parker tackled Mr. Chidester while running full speed.

Under the specific facts of this case, we cannot say that tackling Mr. Chidester was reasonable. Although the situation was threatening, Deputy Parker was armed with an automatic weapon and, according to Mr. Chidester's version of the facts, faced with a compliant suspect whose hands were above his head. Under these facts, engaging Mr. Chidester in such a physical manner was not reasonable.

It is true that the injuries that resulted from the tackle were rather minor and "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Cortez*, 478 F.3d at 1125.  But we have held that "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests–a person's 'sense of security' and individual dignity."  *Holland*, 268 F.3d at 1195.  Therefore, "[p]hysical contact is not required for an excessive force claim–patently unreasonable conduct is."  *Cortez*, 478 F.3d 1131.  Consequently, we conclude that the evidence and the inferences therefrom, viewed in Larry Chidester's favor, support his claim that his Fourth Amendment rights were violated.

### V.

This is not the end of our analysis, however.  We must also determine whether the contours of Larry Chidester's Fourth Amendment rights in this type of situation were clearly established at the time of Deputy Parker's excessive use of force.  This consideration is separate from the initial consideration of whether a constitutional violation occurred.  "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  The doctrine

-19-

therefore "shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v Haugen*, 543 U.S. 194, 198 (2004).

"We have held that, for a right to be clearly established, 'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cortez*, 478 F.3d at 1114-15 (quoting *Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)).

This is not to say that a case must be found that exactly fits the factual contours of the case in question.

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and quotation omitted). Consequently, "'officials can still be on notice that their conduct violates established law even in novel factual circumstances,'" *Cortez*, 478 F.3d at 1115 (quoting *Hope*, 536 U.S. at 741), but only in "obvious" cases, *Brosseau*, 543 U.S. at 199. In other words, "officials committing outrageous, yet sui generis, constitutional violations ought not to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to

-20-

commit a similar transgression." *Jones v. Hunt*, 410 F.3d 1221, 1230 (10th Cir. 2005). This case is not so clear cut.

Keeping the applicable principles in mind, it is useful to examine Deputy Parker's actions in light of pre-existing case law to ascertain whether it would be clear to a reasonable officer that tackling Mr. Chidester was an unlawful use of force in the situation confronted. *See Holland*, 268 F.3d at 1186. It is clearly established that law enforcement officers may not point weapons at suspects that pose no threat. *See Holland*, 268 F.3d at 1192 ("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time."); *Baker v. Monroe Township*, 50 F.3d 1186, 1192-93 (3d Cir. 1995) (holding that while officers conducting a drug raid could place a mother, her seventeen- and fifteen-year-old daughters and seventeen-year-old son who were ascending the stairs of the target residence on the ground, handcuffing them and keeping weapons pointed at them for ten to fifteen minutes while they identified them constituted excessive force); *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992) (pointing a gun at the head of a nine-year-old boy who posed no threat constituted excessive force).

It is also clearly established that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting

-21-

detention or trying to flee. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314-15 (10th Cir. 2002); (holding that a plaintiff's allegations that an officer who was arresting him at a mall for suspected credit card fraud pushed him ten feet into a store window and then pushed his arm up into the middle of his back while handcuffing him, despite the fact that he was passively cooperating, were sufficient to support an excessive force claim)*; Dixon v. Richer*, 922 F.2d 1456, 1462-63 (10th Cir. 1991) (holding that choking a suspect who had been frisked and had his hands on a police vehicle and then hitting him with a flashlight and beating him when he was not resisting constituted excessive force); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (holding that it has long been established in that circuit that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law" and citing cases).

But the facts in these cases are distinguishable in a fair way from those in the case at hand. Here, Mr. Chidester was an unknown adult male encountered at night near the target residence during a SWAT raid where weapons were expected to be encountered. While he complied with Deputy Parker's directions to place his hands above his head, he did not comply with his demand to get on the ground, regardless of how difficult it may have been to accomplish such a feat or how unreasonable a command it was under the circumstances. Mr. Chidester's sudden appearance and failure to get on the ground occurred when Deputy Parker was rushing toward the target house and then at Mr. Chidester in what became a

-22-

rapidly evolving situation where he had little time to ascertain Mr. Chidester's identity and whether he was a threat. While we have determined it was objectively unreasonable for Deputy Parker to tackle Mr. Chidester given Deputy Parker already had a weapon aimed at him, we note the extreme exigency of the situation. The situation is unlike other cases where the suspect person was already identified and then under the officer's total physical control for the purpose of preventing him or her from fleeing, using a weapon, or otherwise becoming a threat. We have not found a case, nor have plaintiffs directed us to one, that would put Deputy Parker on notice his split-second decision to tackle Mr. Chidester under the circumstances presented was clearly unlawful. Thus, we cannot say it was unreasonable for Deputy Parker to mistakenly believe the law allowed a greater level of force for the purpose of obtaining the requisite safety needed during the exigent circumstance presented.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Deputy Parker is entitled to qualified immunity because his conduct fell within the haze that enshrouds the border between excessive and acceptable force in this case. *See Saucier*, 533 U.S. at 206 (quotation omitted).

## VI.

In the final point on appeal, Sergeant Taylor "concedes [for the purposes of appeal] that Plaintiff's Complaint sufficiently alleges the violation of [the

plaintiff's] constitutional right" to be "free of warrantless entries into their home" and that this right "was clearly established at the time of the conduct in question." Aplt. Opening Br. at 47. But he argues that Rule 56-1(c) of the district court's local rules required the district court to accept as fact Deputy Parker and Sergeant Taylor's testimony that they believed they saw two individuals outside of the Chidester home and that a grant of summary judgment to the sergeant was therefore required. Rule 56-1(c) provides in regard to contested facts in summary judgment motions that

> [a]ll material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the statement of the movant will be deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements of Fed. R. Civ. P. 56.

Dist. Utah Civ. R. 56-1. Sergeant Taylor claims that "Plaintiffs simply presented no evidence whatsoever that [he] 'manufactured the fact' that he saw a second individual outside their house, or that there was not a second individual there." Aplt. Opening Br. at 50. We disagree that Rule 56-1(c) entitled Sergeant Taylor to summary judgment under these circumstances; point denied.

## VII.

The district court's denial of summary judgment for Deputy Parker on qualified immunity grounds is REVERSED and the district court is directed to dismiss the claims against him. The district court's denial of summary judgment to Sergeant Taylor on qualified immunity grounds is AFFIRMED.

Judge Hartz dissents as to the reversal of the denial of summary judgment for Deputy Parker.

Entered for the Court

Wade Brorby
Senior Circuit Judge